Nicholson, C. J.,
delivered the opinion- of the Court.
Daniel S. Webb died in Henderson county, leaving his widow, Mary C., and three children. Commissioners were appointed by the County Court to *286 allot to tbe widow a year’s provision. Tbey performed tbis duty by allotting a list of specific articles, in wliicb list was a horse, and various other articles exempt from execution.
This report of tbe commissioners seems to liave been confirmed by tbe court without exception. After tbe allotment of, the widow’s year’s provisions, E. B. Webb, tbe administrator, proceeded to sell tbe perishable property, exclusive of tbe articles allotted to tbe widow. In making tbis sale, be included a number of articles which were exempt by law from execution, among which was an ox wagon, and two horses. Tbe widow, and her present husband, H. S. Brandon, commenced an action against tbe administrator, E. B. Webb, for tbe value of tbe articles of property exempt from execution, which were included in tbe allotment of tbe widow’s year’s provisions, and also for tbe value of tbe exempted articles sold by tbe administrator.
Upon tbe trial of tbe cause, tbe jury returned a verdict in favor of tbe plaintiffs for two hundred and seventeen dollars and eighty cents, for which tbey bad judgment. From tbis judgment defendant appealed in ;error to tbis Court. Tbe questions of law in tbe case ■ arise upon tbe refusal of tbe circuit judge to give to tbe jury the following instructions:
1. That tbe plaintiff could not recover tbe large ox wagon mentioned in the proof, under tbe exemption laws.
*287 2. That she could not claim the three beds set apart and allotted to her by the commissioners, and also other additional beds under the exemption laws.
3. That the plaintiff could not keep and retain the horse set apart to her by commissioners appointed to allot to her a year’s provision, and claim and receive damages for two other horses under the exemption laws, sold by the administrator.
Upon the death of Daniel 8. "Webb all the personal property owned by him, which by law was exempt from execution, was vested in his widow, for herself, and in trust for the benefit of the children of the deceased, or of the widow, or of both; and such property did not go to the administrator: Code 2288.
"When the commissioners allotted to the widow of Daniel S. Webb so much of the crop, stock,, provisions, moneys on hand or du.e, or other assets as they deemed necessary for the support of the. widow and her family for a year, the moneys and effects so set apart were the absolute property of the widow for the support of herself and her family; and could not be taken into the account of the administration of the estate: Code 2285, 2286.
With these two propositions settled — first, that upon the death of Daniel 8. Webb the title to the exempted property vested absolutely in his widow in trust for herself and children — and second, that upon confirmation of “the commissioners’ report *288 the title to the proj>erty allotted, vested in her for tbe benefit of herself and children: Bayliss v. Bayliss, 4 Col., 359; we proceed to the questions raised by the instructions, which the Circuit Judge declined to give to the jury.
1. In the list of articles exempt from execution under see. 2107 of the Code, are the following: “One horse, or mule, or yoke of oxen, one ox cart, ring, staple, and log chain, one two or one-horse wagon, not to exceed seventy-five dollars in value,” etc.
In the inventory and account of sales returned to the County Court by the administrator, is found the entry: “ One wagon sold to David Bice for fifty-three dollars.” In the proof the wagon.' is described as a large ox wagon. The question is, did the wagon become the property of the widow as exempt property upon the death of her husband? It is true, as contended in the argument, that lexicographers define a “cart” to be a vehicle with two wheels, and a “wagon” one with four wheels. The proof makes it clear that the vehicle in question was not a cart, but that it was a wagon — a large wagon with four wheels, and suitable to be drawn with oxen. To ascertain what the legislature meant by “an ox cart,” and by a “two horse wagon,” we must bear in mind the object which they had in view in the long list of articles exempted from execution. It was intended to secure the families of indigent and necessitous persons, whether made so by improvidence or by misfortune, against the *289 sufferings of absolute destitution, by protecting from tlie grasp of greedy creditors sucli articles of property as would enable them to procure a subsistence. Tbe legislative history of the State for the last thirty years furnishes abundant evidence that this humane policy has been constantly growing in popular favor. Looking to the spirit of liberality which has characterized our legislation for so many years, we should not be conforming our action to this well-known policy if we failed to give such liberal construction to the language of the legislature as will promote rather than defeat the object of the law. It was in this spirit that we felt justified, in a recent case, to hold that a jackass used for farming purposes was exempt from execution as a species of horse.[1]
In the same spirit, and with the same object, we now hold that when the legislature used the term “ox cart,” and “two horse wagon,” they did not intend that their language should be taken literally to mean that the cart should not be drawn by any other animals than oxen, nor that the wagon should be drawn by exactly two horses or exactly one horse. These terms were used as descriptive of the vehicles commonly in use on farms not exceeding seventy-five dollars in value. Such vehicles being necessary as a means of obtaining subsistence, were intended to be protected from execution. To suppose that the legislature meant that if a wagon had got the name of an ox *290 wagon because it bad been used witb oxen, it should not be exempt from execution — whereas, if the same wagon had ' been used with two horses, and had got the name of a two horse wagon, it would be exempt, such a supposition would be to attribute to the legislature a palpable absurdity. "We therefore hold that the wagon in question was exempted property.
2. It appears from the proof that the commissioners allotted to the widow three feather beds as part of her year’s provisions, leaving one other bed, which was sold by the administrator. This bed was one of the exempted articles sold by the administrator for the value of which the suit was brought. The Court was requested by the defendant to instruct the jury that the widow could not claim the bed allotted to her for her year’s provision, and also additional beds under the exemption laws.
The Court declined so to charge, and it is now insisted this was error.
By the exemption laws the widow was entitled to three beds upon the death of her husband. The absolute title to these, vested in her, as we have seen, for the benefit of herself and three children. She had the right, as soon as her husband died, to select and set apart three of the beds. It does not appear that she had done this before the commissioners set apart the three beds as part of her year’s provision. It is probable that she was ignorant of her right to make such election. Nor does it ap *291 pear tbat sbe was advised,. either by the administrator or by the commissioners, of her rights under the exemption laws. Her failure to assert her rights cannot estop her from afterwards insisting on 'them, as it does not appear that she acted with a knowledge of her rights. It is clear, therefore, that in allotting to the widow three of the beds, they allotted to her property which already belonged to her. It was their duty to allot the year’s provision out of the crop, stock, provisions, moneys, or other assets which belonged then to the estate.
Three of the beds ceased to belong to the estate, but became the absolute property of the widow and her children upon the death of the intestate. It follows that the commissioners appropriated the value of the three beds, which were the property of the widow, in satisfaction of a claim which she had upon the property of the estate.- And as her acquiescence in this appropriation of her own property took place in ignorance of her rights, she is not thereby precluded from claiming from the administrator the value of the three beds so appro-bated.
3. It appears from the proof that the intestate owned at his death four horses. Of these the law exempted two for the benefit of the widow and children. The commissioners set apart to her, as part of her year’s provision, one of the horses, leaving three others from which she had a right to select two as exempted property. The court 'was requested to instruct the jury, that the widow could *292 not retain the horse allotted to her by the commissioners, and also claim the value of two other horses as exempted property.
The court declined so to charge, and there was no error in so doing. The correctness of the ruling depends upon the question whether the commissioners could legally allot to the widow one of the horses op hand as part of her year’s provision. They were authorized by see. 2285, “to set apart so much of the crop, stock, provisions, moneys on hand or due, or other assets as may be necessary,” etc. IJnde/ the term “stock” it was competent for the commissioners to set apart a “ horse.” In Bayliss v. Bayliss, 4 Col., 359, Judge Milligan held that the commissioners could not set apart a horse in addition to other articles set apart, if there was no horse then on hand. -By necessary implication it follows that if the horse had been on hand, the allotment would have been proper.
The administrator sold two horses which belonged to the widow under the exemption laws. It is not material that she was present at the sale, and failed to assert her claim to the exempted articles, as it does not appear that she was apprised of her rights. On the contrary, she states in her evidence, that before the sale, she suggested to the administrator that she ought to have the claybank mare, when he informed her, that “ as there was no written will left by her husband, the things would have to be sold.” It is clear, therefore, that she acquiesced in the sale of the ex *293 empted property, not only in ignorance of lier rights, but under an erroneous impression as to her claim, produced by the mistaken, view of the law on the part of the administrator. It follows that the commissioners had the right, under the law, to allot to her a horse, but -that did not interfere with her claim to other -horses under the exemption laws. It results that there was no error in the refusal of the circuit judge to give the> instructions to the jury requested by the defendant; nob do we find any error in the instructions'-as-given <to the jury in the charge.
The judgment below is affirmed.

 Richardson v. Duncan, 2 Heis., 220.